**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| JUSTIN MAESTRI, *et al.*, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>MERCEDES-BENZ USA, LLC and DAIMLER AG,<br><br>    Defendants. | Case No. _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

**Page**

NATURE OF CLAIMS ..................................................................................1

JURISDICTION AND VENUE ....................................................................7

THE PARTIES ..............................................................................................9

GENERAL FACTUAL ALLEGATIONS ....................................................45

TOLLING OF THE STATUTE OF LIMITATIONS ....................................73

    I.    Fraudulent Concealment ..................................................73

    II.   Estoppel ............................................................................74

    III.  Discovery Rule ..................................................................74

CLASS ACTION ALLEGATIONS ..............................................................75

    I.    Numerosity ........................................................................76

    II.   Predominance of Common Issues ....................................77

    III.  Typicality ..........................................................................80

    IV.  Adequate Representation ..................................................80

    V.   Superiority ........................................................................80

REALLEGATION AND INCORPORATION BY REFERENCE ....................83

CLAIMS FOR RELIEF ................................................................................83

    1.    Violation of the Magnuson-Moss Warranty Act, 15 U.S.C.
        §§ 2301, *et seq.* ................................................................83

# TABLE OF CONTENTS
## (continued)

**Page**

2.      Fraudulent Concealment ..................................................................89

3.      Negligence .....................................................................................93

4.      Unjust Enrichment ........................................................................96

5.      Violation of the Georgia Fair Business Practices Act, Ga. Code Ann. §§ 10-1-390, *et seq.*..........................................................97

PRAYER FOR RELIEF ......................................................................104

DEMAND FOR JURY TRIAL ..........................................................105

Plaintiffs, based on personal knowledge as to themselves, and upon information and belief as to all other matters, allege as follows:

## NATURE OF CLAIMS

1. The things meant to protect us should not be made in a way that harms or even kills us. This is particularly true of cars because they are a tool millions of people use every day. People trust that their cars were designed and built to keep them safe. And they expect that automakers (also known as "original equipment manufacturers" or "OEMs") take every reasonable step to make sure that nothing in their cars endangers the lives of those who ride in them.

2. This action concerns defective airbags manufactured by Takata Corporation and its related entities ("Takata"), which contain inflators using the notoriously volatile and unstable compound, ammonium nitrate, but which were nevertheless equipped in vehicles that Mercedes, and its related entities manufactured, sold or leased, or knowingly misrepresented as safe, when in fact they could explode and maim or kill drivers and passengers..

3. An airbag is a critical safety feature of any motor vehicle. Airbags are meant to prevent occupants from striking hard objects in the vehicle, such as the steering wheel, dashboard, or windshield. An airbag's inflator, as its name suggests, is supposed to rapidly inflate the airbag upon vehicle impact. In the

1

milliseconds following a crash, the inflator ignites a propellant to produce gas that is released into the airbag cushion, causing the airbag cushion to expand and deploy. The term "airbag" shall be used herein to refer to the entire airbag module, including the inflator.

4.     All Takata airbags at issue in this litigation share a common, uniform defect: the use of ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in Defendants' defectively designed inflators (the "Inflator Defect"). Under ordinary conditions, including daily temperature swings and contact with moisture in the air, Takata's ammonium nitrate propellant transforms and destabilizes, causing irregular and dangerous behavior ranging from inertness to violent combustion. Ammonium nitrate is well-known for its explosive power. Indeed, it is the explosive that Timothy McVeigh and Terry Nichols used in April 1995 to bomb the Alfred P. Murrah Federal Building in downtown Oklahoma City. In 2006, a Takata factory suffered a severe explosion because of ammonium nitrate, a fact known to its OEM clients, including Defendants. In August 2016, a truck carrying Takata airbag parts crashed on a Texas road, detonating the ammonium nitrate in the truck in an immense blast, destroying a home, killing its elderly owner, and injuring four of her visitors.

5.      Because of the common, uniform Inflator Defect, Takata airbags often fail to perform as they should.  Instead of protecting vehicle occupants from bodily injury during accidents, the defective Takata airbags too often violently explode, sometimes expelling metal debris and shrapnel at drivers and passengers.  As of July 2017, Takata airbags have been responsible for at least 12 deaths and 180 serious injuries in the United States alone.

6.      In the late 1990s, when Takata shelved a safer propellant in favor of the far cheaper ammonium nitrate, it was aware of these risks and did so over the objections and concerns of its engineers in Michigan.  Tellingly, Takata is the only major airbag manufacturer that uses ammonium nitrate as the primary propellant in its airbag inflators.

7.      On information and belief, Defendants were intimately involved in the design and testing of the airbags that contained the Inflator Defect. When the Defendants approved Takata's airbags, and purchased them for installation in their vehicles, they were or should have been aware that the airbags used the volatile and unstable ammonium nitrate as the primary propellant in the inflators.

8.      Defendants also knew or should have known that the Takata airbags were experiencing the same problems in other OEMs' vehicles. Takata and its OEM customers first received word of startling airbag failures in the field no later

3

than 2003, when a Takata inflator ruptured in a BMW vehicle. Other ruptures and injuries took place in Honda vehicles in 2004 and 2007. After years of downplaying the danger, Honda issued a public recall in the United States in 2008, putting all OEMs, including Defendants, on even greater notice of the danger. The alarm bells should have only grown louder in the coming years, as Honda and Takata issued further United States recalls of airbags with the Inflator Defect in 2009, 2010, 2011, and 2013, leading up to the record-breaking recalls that followed from 2014 onward. Yet, despite the repeated Takata/Honda recalls, Defendants utterly failed to take reasonable, let alone sufficient, measures to investigate or protect their purchasers and lessees, or the public. Indeed, even as other OEMs began taking proactive remedial measures (however belated and ineffective), Defendants remained silent and on the sidelines.

9.     By May 2015, Takata had filed Defect Information Reports admitting the defect, and it would continue to add inflator models through additional DIRs in the coming years. Despite the overwhelming evidence of the defect, Defendants were not issuing recalls, warning consumers, or otherwise protecting them from the risk, for example through systematic loaner vehicle programs. In correspondence to Plaintiffs and consumers in December 2017 and January 2018, Mercedes acknowledged that "the availability of replacement parts is taking longer than

4

anticipated." It also indicated that it needed to obtain an extension of time from NHTSA to provide replacement parts, and that for certain vehicle owners belonging to a particular priority group established by NHTSA, replacement parts would not be expected to be available until March 31, 2018. The Defendants' delay is consequential—it exposes purchasers, lessees, drivers, passengers and, indeed, the general public, to ongoing and unnecessary risk of harm.

10.    Plaintiffs and consumers are in the frightening position of having to drive dangerous vehicles for many months or years while they wait for Defendants to replace the defective airbags in their cars. They are effectively left without a safe vehicle to take them to and from work, to pick up their children from school or childcare, or, in the most urgent situations, to transport themselves or someone else to a hospital.

11.    Even more troubling, many of the replacement airbags that Takata and the OEMs are using to "repair" recalled vehicles suffer from the same common, uniform defect that plagues the airbags being removed—they use unstable and dangerous ammonium nitrate as the propellant, a fact that Takata's representative admitted at a Congressional hearing in June 2015. Takata's representative also repeatedly refused to provide assurances that Takata's replacement air bags are safe and defect-free.

12.     Defendants knew, and certainly should have known, that the Takata airbags installed in millions of vehicles were defective. By concealing their knowledge of the nature and extent of the defect from the public, while continuing to advertise their products as safe and reliable, Defendants have shown a blatant disregard for public welfare and safety. Moreover, Defendants have violated their affirmative duty, imposed under the Transportation Recall Enhancement, Accountability, and Documentation Act (the "TREAD Act"), to promptly advise customers about known defects.

13.     As a result of this misconduct, Plaintiffs and members of the proposed Class were harmed and suffered actual damages.  Plaintiffs and the Class did not receive the benefit of their bargain; rather, they purchased or leased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation.  Purchasers or lessees of the Class Vehicles paid more, either through a higher purchase price or higher lease payments, than they would have had the Inflator Defect been disclosed.  Plaintiffs and the Class were deprived of having a safe, defect-free airbag installed in their vehicles, and Defendants unjustly benefited from their unconscionable delay in recalling its defective

products, as it avoided incurring the costs associated with recalls and installing replacement parts for many years.

14.     Plaintiffs and the Class also suffered damages in the form of out-of-pocket and loss-of-use expenses and costs, including but not limited to expenses and costs associated with taking time off from work, paying for rental cars or other transportation arrangements, and child care.  Also, as a direct result of misconduct by Defendants, Plaintiffs and each Class member has or will have out-of-pocket economic damage by virtue of the time and expense of taking the time to bring their car in for repair.

15.     Plaintiffs and the Class also suffered damages as a result of Defendants' concealment and suppression of the facts concerning the safety, quality, and reliability of Defendants' vehicles with the defective Takata airbags. Defendants' false representations and omissions concerning the safety and reliability of those vehicles, and their concealment of the known safety defects plaguing those vehicles and its brand, caused Plaintiffs and certain Class members to purchase or retain Defendants' vehicles of diminished value.

## JURISDICTION AND VENUE

16.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff

Class are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

17.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction. This Court has personal jurisdiction over Defendants because at least one is a resident of Georgia, and pursuant to O.C.G.A. 9-10-91, because Defendants transact substantial business in this District; some of the tortious acts or omissions giving rise to the Complaint took place in this District; and some of Plaintiffs' claims arise out of Defendants operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state, committing a tortious act in this state, and causing injury to property in this state arising out of Defendants' acts and omissions outside this state; and at or about the time of such injuries Defendants were engaged in solicitation or service activities within this state, or products, materials, or things processed, serviced, or manufactured by Defendants anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in

this District, Defendants have caused harm to Class members residing in this District, and Defendants are residents of this District under 28 U.S.C. § 1391(c)(2) because they are subject to personal jurisdiction in this District.

## THE PARTIES

19.     Daimler Aktiengesellschaft ("Daimler AG") is a foreign corporation headquartered in Stuttgart, Baden-Württemberg, Germany. Daimler AG is in the business of designing, developing, manufacturing, marketing, and selling luxury automobiles.

20.     Mercedes-Benz USA, LLC ("MBUSA") is a Delaware limited liability corporation whose principal place of business is 303 Perimeter Center North, Suite 202, Atlanta, Georgia, 30346. Until approximately July 2015, Mercedes' principal place of business was 1 Mercedes Drive, Montvale, New Jersey 07645. Daimler AG is the parent corporation of MBUSA. Daimler AG and MBUSA are collectively referred to as "Mercedes" or "Defendants."

21.     Defendants engineered, designed, developed, manufactured, and installed the Defective Airbags on the Class Vehicles, and approved the Defective Airbags for use on those vehicles. They also developed, reviewed, and approved the marketing and advertising campaigns designed to sell these Class Vehicles.

22.    Plaintiff Justin Maestri resides in Oxnard, California. Plaintiff Maestri owned a 2010 Mercedes E-63 which he purchased used on December 26, 2014 for approximately $68,900 from W.I. Simonson Mercedes in Santa Monica, California. Plaintiff Maestri purchased an extended warranty for his 2010 E-63. Prior to purchasing the vehicle, Plaintiff viewed advertisements through the internet that touted the safety and dependability of his vehicle and Mercedes vehicles generally. Plaintiff Maestri received a letter from Mercedes in May 2016 informing him that his 2010 Mercedes E-63 contains Takata airbags with the Inflator Defect that are subject to recall. Concerned for his family's safety, Plaintiff Maestri stopped using his 2010 Mercedes E-63 as a family transport vehicle upon learning of the recall. To Plaintiff Maestri's knowledge, the airbags in his 2010 Mercedes E-Class were not repaired or replaced. Plaintiff visited and called approximately twenty (20) dealerships before he found one that would buy his 2010 Mercedes E-63 from him. Plaintiff Maestri sold his 2010 Mercedes E-63 to Rusnak Westlake Porsche in Thousand Oaks, California on November 15, 2017, at a loss of $7,726.73. The value of Plaintiff's vehicle was diminished as a result of the Inflator Defect. Plaintiff would not have purchased the vehicle or would not have paid as much for it had Plaintiff known of the problems or risk associated with the vehicle's Inflator Defect.

23.     Plaintiff Ericka Black resides in Boston, Massachusetts. Plaintiff Black owns a 2013 Mercedes C-250, which was purchased used on July 1, 2017 for approximately $15,497 from Imotobank Dealership in Walpole, Massachusetts. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through radio, television, and the internet that touted Mercedes's positive reputation for manufacturing safe and dependable vehicles. To Plaintiff Black's knowledge, the airbags in her 2013 Mercedes C-250 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

24.     Plaintiff Tiffany Bolton resides in Waco, Texas. Plaintiff owns a 2012 Mercedes-Benz GL 450, which was purchased new in October 2012 for $64,640.00 from Mercedes-Benz of Waco in Waco, Texas. To Plaintiff's knowledge, the airbags in her 2012 Mercedes-Benz GL 450 have never been repaired or replaced. The value of her 2012 Mercedes-Benz GL 450 has been diminished as a result of the Inflator Defect. Prior to purchasing her 2012 Mercedes-Benz GL 450, Plaintiff viewed or heard about the vehicle's safety features through TV advertisements and the Internet. If Plaintiff Bolton had known

11

about the Inflator Defect, she would not have purchased the vehicle or would not have paid as much as she did for it.

25.     Plaintiff Darren Boyd resides in New Windsor, New York. Plaintiff owns a 2009 Mercedes ML350, which was purchased used in or about 2010 for approximately $38,000 from the Benzel-Busch Mercedes-Benz dealership in Englewood, New Jersey. Plaintiff's 2009 Mercedes ML350 was covered by a factory warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard commercials that touted Mercedes's long record of durability and safety. Plaintiff learned of these recalls when he visited the dealership to potentially trade in the vehicle. Plaintiff visited Benzel-Busch and called Mercedes's corporate office to inquire about scheduling a repair or replacement of the airbags in his 2009 Mercedes ML350, and was told by a Mercedes employee or representative that the repair or replacement parts were not yet available. To Plaintiff's knowledge, the airbags in his 2009 Mercedes ML350 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

26.     Plaintiff Daphne Bridges resides in Charlotte, North Carolina. Plaintiff owns a 2014 Mercedes C-250, which was purchased used in or about

April 2015 for approximately $22,019 from Hendrick Motors of Charlotte Mercedes-Benz in Charlotte, North Carolina. Plaintiff's 2014 Mercedes C-250 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard advertisements that touted Mercedes's long record of durability and safety generally. The sales representative at Hendrick Motors emphasized the superior features, including safety features of the Mercedes C-250. Plaintiff learned of these recalls through news reports and received a postcard from Defendant Mercedes on or about November 1, 2017 regarding the availability of replacement parts. To Plaintiff's knowledge, the airbags in her 2014 Mercedes C-250 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

27.     Plaintiff Randy Brown resides in Milford, Ohio. Plaintiff Brown owns a 2008 Mercedes C-300, which he purchased new on May 31, 2008, for approximately $38,853 from Mercedes-Benz of West Chester, Ohio. Plaintiff's Mercedes C-300 is covered by a written warranty, and Plaintiff Brown also purchased an extended warranty. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through television, magazines, and brochures that touted the

13

safety and dependability of his vehicle and Mercedes vehicles generally. Plaintiff Brown learned of the recalls from letters he received from Defendant Mercedes in or about May and August 2016, notifying him that the Takata driver-side and passenger-side frontal airbags in Plaintiff's 2008 C-300 were subject to recall. To Plaintiff Brown's knowledge, the airbags in his 2008 Mercedes C-300 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

28.     Plaintiff Cheryl Butler-Adams resides in Henderson, Nevada. Plaintiff owns a 2011 Mercedes C-330, which was purchased used in or about November 2015 for approximately $18,988 from Apex Auto of Fremont, California. Plaintiff's 2011 Mercedes C-330 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard advertisements that touted Mercedes's long record of durability and safety. Plaintiff learned of these recalls through news reports. Plaintiff Butler-Adams also received a letter from Defendant Mercedes notifying her that the Takata frontal airbag in her 2011 Mercedes C-330 was subject to recall. Since receiving the notification from Defendant Mercedes, Plaintiff has called Mercedes every few months to check on the status of the recall.

14

Defendant Mercedes has told Plaintiff that no repair or replacement parts are available, and that her situation is "not that serious," and "not a priority." To Plaintiff's knowledge, the airbags in her 2011 Mercedes C-330 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

29.     Plaintiff Michael Cahill resides in West Hollywood, California. Plaintiff owns a 2010 Mercedes ML350, which was purchased used in or about 2011 for approximately $40,000 from Keyes European Mercedes-Benz in Van Nuys, California. Plaintiff's 2010 Mercedes ML350 was covered by a factory warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard commercials that touted Mercedes's long record of durability and safety. Plaintiff learned of these recalls through a mailing from Takata. To Plaintiff's knowledge, the airbags in his 2010 Mercedes ML350 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

30.     Plaintiff Paulette Calhoun resides in Atlanta, Georgia. Plaintiff Calhoun owns a 2011 Mercedes C-300, which she purchased used in September 2015 for approximately $16,800 from a private individual in Atlanta, Georgia. Plaintiff Calhoun purchased an extended warranty for her 2011 C-300 from Nations Auto Protection. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through radio, television, and the internet that touted the safety and dependability of her vehicle and Mercedes vehicles generally. To Plaintiff Calhoun's knowledge, the airbags in her 2011 C-300 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

31.     Plaintiff Robert Cervelli resides in Abington, Massachusetts. Plaintiff Cervelli owns a 2010 Mercedes E-350 Coupe, which he purchased used on September 3, 2014, for approximately $32,685 from Midway Automotive in Abington, Massachusetts. Plaintiff Cervelli's 2010 E-350 Coupe was covered by a written warranty at the time that he purchased it. Prior to purchasing the vehicle, Plaintiff viewed advertisements through the internet that touted the safety and dependability of his vehicle and Mercedes vehicles generally. Plaintiff received a recall notice from Mercedes in August 2016, informing him that his 2010 E-350

Coupe contains Takata airbags with the Inflator Defect that are subject to recall. To Plaintiff Cervelli's knowledge, the airbags in his 2010 E-350 Coupe have not been repaired or replaced. Defendant Mercedes informed Plaintiff Cervelli that it could take up to two years before the parts are available to replace the defective airbags in his 2010 E-350 Coupe. Plaintiff's local Mercedes dealership has refused to accept Plaintiff Cervelli's vehicle as a trade in for full retail value. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

32.     Plaintiff Loretta Collier resides in Madison, Alabama. Plaintiff owns a 2013 Mercedes-Benz Sprinter Motor Home, which was purchased new in August 2012 for $102,474.77 from Camping World in Calera, Alabama. To Plaintiff's knowledge, the airbags in her 2013 Mercedes-Benz Sprinter Motor Home have never been repaired or replaced. The value of her 2013 Mercedes-Benz Sprinter Motor Home has been diminished as a result of the Inflator Defect. Plaintiff sold the subject vehicle on August 3, 2016 for $65,000.  If Plaintiff Collier had known of the Inflator Defect, she would not have purchased the 2013 Mercedes-Benz Sprinter Motor Home or would not have paid as much as she did for it.

33.     Plaintiff Sherri Cook resides in Addison, Texas. Plaintiff owns a 2009 Mercedes C-300, which was purchased new on November 14, 2008, for $48,005 from Mercedes Ewing Autohouse in Plano, Texas. Plaintiff's 2009 Mercedes C-300 was covered by a written warranty. Plaintiff Cook also purchased an extended warranty. Prior to purchasing the vehicle, Plaintiff Cook viewed and heard advertisements that touted Mercedes's long record of durability and safety. Plaintiff learned of these recalls from news reports and also from a letter she received from Mercedes in or about August 2016. Since receiving the notification from Mercedes about the Takata airbag recall, Plaintiff has called Mercedes several times, in 2016 and 2017, to check on the status of the recall. Defendant Mercedes has told Plaintiff that no repair or replacement parts are available and, after expressing her concern about the dangerous condition caused by the Takata airbag, Mercedes responded that the "good news is there hasn't been a reported Mercedes airbag problem." In early December 2017, Mercedes told Plaintiff that replacement parts might be available in April 2018. The airbags in Plaintiff Cook's 2009 Mercedes C-300 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

18

34.     Plaintiff Vernettia Davis resides in Mesquite, Texas. Plaintiff Davis owns a 2012 Mercedes E-350, which she purchased used on April 3, 2016, for approximately $26,875 from Legend Auto in Plano, Texas. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through radio, television, and the internet that touted the safety and dependability of her vehicle and Mercedes vehicles generally. Plaintiff Davis received a notice from Mercedes informing her that the Takata airbags in her 2012 Mercedes E-350 contain the Inflator Defect, and are subject to recall. She has attempted to contact Mercedes to schedule a repair or replacement under the recall, but Mercedes has not responded to her inquiries. To Plaintiff Davis's knowledge, the airbags in her 2012 E-350 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

35.     Plaintiff Diego DelaCruz resides in Holland, Michigan. Plaintiff DelaCruz owns a 2011 Mercedes C-300 Sports Sedan 4matic, which was purchased used on September 6, 2014, for approximately $19,926 from Mercedes of Naperville in Naperville, Illinois. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through radio, television, and the internet that touted

19

the safety and dependability of his vehicle and Mercedes vehicles generally. To Plaintiff Delacruz's knowledge, the airbags in his 2011 Mercedes C-300 Sports Sedan 4matic have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

36.    Plaintiff Jody Dorsey resides in Utica, New York. Plaintiff owns a 2008 Mercedes C-300, which was purchased used in or about June 2015, for approximately $16,867 from Nimey's The New Generation in Utica, New York. Plaintiff's 2008 Mercedes C-300 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard advertisements that touted Mercedes's long record of durability and safety generally. The sales representative at Nimey's the New Generation emphasized the superior features, including safety features, of the Mercedes C-300. Plaintiff learned of these recalls through news reports, and received postcards from Mercedes in or about April 2016 and August 2016 regarding the availability of replacement parts. To Plaintiff's knowledge, the airbags in his 2008 Mercedes C-300 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If

Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

37.   Plaintiff Heidi Elliott resides in Bronx, New York. Plaintiff Elliott leased a used 2013 Mercedes C-300, for which she paid a total of approximately $23,625. The lease began on November 14, 2016, and was originated at New Rochelle Hyundai in in New Rochelle, New York. Plaintiff Elliott's 2013 C-300 was covered by a written warranty at the time she leased it. Prior to leasing the vehicle, Plaintiff viewed or heard commercials through television that touted the safety and dependability of Mercedes vehicles generally. To Plaintiff Elliott's knowledge, the airbags in her 2013 Mercedes C-300 have not been repaired or replaced. Plaintiff is no longer leasing the vehicle as of December 8, 2017. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not leased the vehicle, or would not have paid as much as she did for it.

38.   Plaintiff Sam Fragale resides in Dallas, Texas. Plaintiff owns a 2014 Mercedes C-250, which was purchased used in or about October 2014, for approximately $28,950 from eCarOne in Carrollton, Texas. Plaintiff's 2014 Mercedes C-250 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard advertisements that touted Mercedes's long

record of durability and safety. Plaintiff learned of these recalls from news reports. Plaintiff contacted the Mercedes of Plano dealership on October 30, 2017, to check on the status of the recall. The dealership initially told Plaintiff that his car was not part of the recall, and that no repair or replacement parts were available. On or about November 28, 2017, Plaintiff received a notice from Mercedes regarding the airbag recall, stating that replacement parts were not available. To Plaintiff's knowledge, the airbags in his 2014 Mercedes C-250 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

39.    Plaintiff Julius Fulmore resides in Greensboro, North Carolina. Plaintiff owns a 2014 Mercedes-Benz Sprinter Motor Home, which was purchased used in January 2015 for approximately $72,500 from Performance Unlimited in Wolfforth, Texas. To Plaintiff's knowledge, the airbags in his 2014 Mercedes-Benz Sprinter Motor Home have never been repaired or replaced. The value of his 2014 Mercedes-Benz Sprinter Motor Home has been diminished as a result of the Inflator Defect. If Plaintiff Fulmore had known of the Inflator Defect, he would not have purchased the 2014 Mercedes-Benz Sprinter Motor Home or would not have paid as much as he did for it.

22

40.     Plaintiff Mirsad Gacic resides in Chicago, Illinois. Plaintiff Gacic owns a 2010 Mercedes E-350, which he purchased used in April 2014, for approximately $29,000 from Grossinger Motors Mercedes-Benz in Normal, Illinois. Plaintiff Gacic purchased an extended warranty for the vehicle. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through radio, television, brochures, and pamphlets that touted the safety and dependability of his vehicle and Mercedes vehicles generally. To Plaintiff Gacic's knowledge, the airbags in his 2010 E-350 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

41.     Plaintiff Pren Gjuraj resides in Shelton, Connecticut. Plaintiff owns a 2010 Mercedes GL450, which she purchased used in or about March 2015, for approximately $30,000 from Mercedes-Benz of Greenwich in Greenwich, Connecticut. Plaintiff's 2010 Mercedes GL450 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard commercials that touted Mercedes's long record of durability and safety. Plaintiff learned of these recalls through news reports. Plaintiff called Mercedes-Benz of Greenwich to inquire about scheduling a repair or replacement of the airbags in his 2010 Mercedes

23

GL450, and was told to call another local dealership about the potential to repair the vehicle. To Plaintiff's knowledge, the airbags in his 2010 Mercedes GL450 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

42.    Plaintiff William Goldberg resides in Seattle, Washington.  Plaintiff owns a 2011 Mercedes-Benz GLK 350, which was purchased new in approximately December 2010 or January 2011 from Barrier Mercedes k/n/a Mercedes-Benz of Bellevue in Bellevue, Washington. To Plaintiff's knowledge, the airbags in his 2011 Mercedes-Benz GLK 350 have never been repaired or replaced. Plaintiff no longer owns the vehicle, but did receive two recall notices. He contacted Mercedes-Benz of Bellevue after receiving the notices and told them that he was concerned about his wife driving the vehicle.  He was told replacement parts were not available and they could not do anything.  Plaintiff recalls meeting with the head of the used car department and was informed that the vehicle had no value and that they were not interested in purchasing it.  Ultimately, in July 2016, the vehicle was traded in for a new GLC 300 at a diminished value of only $14,000.  Plaintiff opted for this option as he did not want his wife driving the

vehicle any longer.  The dealership informed him that they could not dispose of the vehicle until the airbags were replaced/repaired.   Prior to purchasing his 2011 Mercedes-Benz GLK 350, Plaintiff viewed or heard about the vehicle's safety features through TV advertisements, print advertisements, and brochures given to him by his dealer. If Plaintiff Goldberg had known of the Inflator Defect, he would not have purchased the 2011 Mercedes-Benz GLK 350 or would not have paid as much as he did for it.

43.   Plaintiff Melinda M. Harms resides in Bloomington, Illinois. Plaintiff owns a 2008 Mercedes SLK-280, which was purchased new in or about June 2008, for approximately $47,898 from Sud's Motor Car Company Mercedes-Benz in Normal, Illinois. Plaintiff's 2008 Mercedes SLK-280 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard advertisements that touted Mercedes's long record of durability and safety. Plaintiff Harms learned of the recall from a letter she received from Mercedes in or about May 2016, notifying her that the Takata driver-side frontal airbag in Plaintiff's 2008 SLK-280 was subject to recall. Plaintiff received a postcard mailer from Mercedes in or about February 2017, stating that Mercedes will notify her when replacement parts become available. Since then, Plaintiff Harms has contacted her dealership twice about the status of the recall. The Mercedes

dealership has told Plaintiff that no repair or replacement parts are available. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

44.     Plaintiff Debrah Henry resides in San Gabriel, California. Plaintiff Henry owns a 2009 Mercedes C-300, which she purchased used on February 22, 2013, for approximately $23,000 from House of Imports Mercedes-Benz in Buena Park, California. Plaintiff Henry purchased an extended warranty for her vehicle. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through radio, television, and the internet that touted the safety and dependability of her vehicle and Mercedes vehicles generally. Plaintiff Henry learned of the recalls from letters she received from Mercedes in or about May and August 2016, notifying her that the Takata driver-side and passenger-side frontal airbags in Plaintiff's 2009 C-300 were subject to recall. To Plaintiff Henry's knowledge, the airbags in her Mercedes C-300 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

26

45.     Plaintiff Charles Hudson resides in Franklin, Michigan. Plaintiff Hudson owns a 2011 Mercedes GLK-350, which he leased new beginning in or about August 2011, and then purchased in or about February 2014, for approximately $38,720 from Mercedes of Novi in Novi, Michigan. Plaintiff Hudson's 2011 Mercedes GLK-350 was covered by a written warranty. Prior to leasing and purchasing the vehicle, Plaintiff viewed or heard commercials through television and print advertisements that touted the safety and dependability of his vehicle and Mercedes vehicles generally. Plaintiff Hudson received a recall notice from Mercedes in February 2016, informing him that the Takata airbags in his 2011 GLK-350 are subject to recall due to the Inflator Defect. Mercedes has told Plaintiff Hudson multiple times via phone and email that there are no parts available to replace the Takata airbags in his vehicle. To Plaintiff Hudson's knowledge, the airbags in his 2011 Mercedes GLK-350 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not leased the vehicle, or would not have paid as much as he did for it.

46.     Plaintiff Lillian Johnson resides in Harrisburg, Pennsylvania. Plaintiff Johnson owns a 2010 Mercedes E-350, which she purchased used on February 16, 2011, for approximately $47,800 from Sun Motor Cars, Inc. Mercedes in

Mechanicsburg, Pennsylvania. Plaintiff Johnson's 2010 Mercedes E-350, was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through television, internet, brochures, and pamphlets that touted the safety and dependability of her vehicle and Mercedes vehicles generally. Plaintiff Johnson received a notice from Mercedes in 2016 informing her that the Takata airbags in her 2010 E-350 are subject to recall due to the Inflator Defect. To Plaintiff Johnson's knowledge, the airbags in her 2010 Mercedes E-350 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

47.     Plaintiff Susan Knapp resides in Van Meter, Iowa. Plaintiff owned a 2011 Mercedes E-550, which she purchased new in June 2011, for approximately $77,420 from a Mercedes-Benz dealership in Des Moines, Iowa. Plaintiff's 2011 Mercedes E-550 was covered by a written warranty. Prior to purchasing her vehicle, Plaintiff Knapp viewed or heard advertisements that touted Mercedes's long record of durability and safety. Plaintiff Knapp learned of the recall from a letter she received from Mercedes in or about May 2016, notifying her that the Takata driver-side front airbag in Plaintiff's 2011 Mercedes E-550 was subject to

recall. Plaintiff also received a postcard mailer from Mercedes in or about September 2016, stating that Mercedes will notify her when replacement parts become available. After receiving the letter, Plaintiff contacted Mercedes about the timing of the airbag replacement, and was told that there was no current plan to begin installing replacement airbags, and that no other information was available regarding the timing or availability of replacement airbags. The value of Plaintiff's vehicle was diminished as a result of the Inflator Defect. On or about November 1, 2017, Plaintiff traded in her 2011 Mercedes E-550 for $22,000.  If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

48.    Plaintiff Christopher Michael Knox resides in Columbia, South Carolina. Plaintiff owns a 2009 Mercedes C-300, which was purchased used in or about September 2013, for approximately $20,000 from Sun Motor Cars, Inc. Mercedes in Mechanicsburg, Pennsylvania. Plaintiff's 2009 Mercedes C-300 was covered by a written warranty. Prior to purchasing his vehicle, Plaintiff Knox viewed and heard Mercedes advertisements in print, on television, the internet, and the radio touting the safety and durability of Mercedes's vehicles. Plaintiff learned of these recalls from news reports, and also from a letter he received from Defendant Mercedes in or about February 2017, notifying him that the Takata front

airbags in Plaintiff's 2009 Mercedes C-300 were subject to recall. Plaintiff contacted the Dick Dyer Mercedes dealership several times to check the status of the recall, but has consistently been told that no airbag replacement parts are available. To Plaintiff's knowledge, the airbags in his 2009 Mercedes C-300 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

49.     Plaintiff Branko Krmpotic resides in North Bergen, New Jersey. Plaintiff owns a 2012 Mercedes C-300, which he purchased used in or about January 2015, for approximately $26,500 from Prestige Motors Mercedes-Benz in Paramus, New Jersey. Plaintiff's 2012 Mercedes C-300 was covered by a written warranty. Prior to purchasing his vehicle, Plaintiff Krmpotic viewed and heard Mercedes advertisements touting the safety and durability of Mercedes's vehicles. Plaintiff learned of the recall from a letter he received from Defendant Mercedes in or about February 2017, notifying him that the Takata front airbags in Plaintiff's 2012 Mercedes C-300 were subject to recall. After receiving the letter, Plaintiff contacted Defendant Mercedes about the timing of the airbag replacement, and was told that there was no current plan to begin installing replacement airbags, and that

no other information was available regarding the timing or availability of replacement airbags. To Plaintiff's knowledge, the airbags in his 2012 Mercedes C-300 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

50.     Plaintiff Celeste Lewis resides in Mansfield, Texas. Plaintiff owns a 2010 Mercedes-Benz C300, which was purchased used on June 26, 2014 for $29,799.84 from Park Place Motorcars Mercedes-Benz of Dallas in Dallas, Texas. Plaintiff viewed or heard commercials through radio, television, brochures, and pamphlets that touted the safety and dependability of her vehicle and Mercedes-Benz vehicles generally. To Plaintiff's knowledge, the airbags in her 2010 Mercedes-Benz C300 have never been repaired or replaced.  Plaintiff has been told by the dealership that replacement parts are unavailable and that it is unknown as to when they will be available.  The value of her 2010 Mercedes-Benz C300 has been diminished as a result of the Inflator Defect.  If Plaintiff Lewis had known of the Inflator Defect, she would not have purchased the 2010 Mercedes-Benz C300 or would not have paid as much as she did for it.

51.     Plaintiff   Shanetha   Livingston   resides   in   Harrison   Township, Michigan. Plaintiff owns a 2008 Mercedes C-300, which she purchased new in or about September 2008, for approximately $45,000 from Mercedes-Benz of St. Clair Shores, in St. Clair Shores, Michigan. Plaintiff's 2008 Mercedes C-300 was covered by a factory warranty. Plaintiff learned of these recalls through news reports. To Plaintiff's knowledge, the airbags in her 2008 Mercedes C-300 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

52.     Plaintiff Alexander Lonergan resides in South River, New Jersey. Plaintiff owns a 2006 Mercedes C-230, which he purchased new in or about December 2005, for approximately $38,370 from Ray Catena Motor Car Corp. Mercedes-Benz in Edison, New Jersey. Plaintiff's 2006 Mercedes C-230 was covered by a written warranty. Prior to purchasing his vehicle, Plaintiff Lonergan viewed and heard Mercedes advertisements touting the safety and durability of its' vehicles. Plaintiff learned of these recalls from news reports, and from a letter he received from Mercedes, notifying him that the Takata front airbags in Plaintiff's 2006 Mercedes C-230 were subject to recall. The value of Plaintiff's vehicle has

been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

53.     Plaintiff Scott Lusby resides in Sherman Oaks, California. Plaintiff owns a 2010 Mercedes GLK350, which he purchased used in or about 2014 for approximately $31,000 from Mercedes Calabasas in Calabasas, California. Plaintiff's 2010 Mercedes GLK350 was covered by a factory warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard commercials that touted Mercedes's long record of durability and safety. Plaintiff learned of these recalls through news reports. Plaintiff received numerous postcards about the recall stating that scheduling a repair or replacement of the airbags in his 2010 Mercedes GLK350 was not yet available. To Plaintiff's knowledge, the airbags in his 2010 Mercedes GLK350 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

54.     Plaintiff Bassam Makhoul, resides in East Lansing, Michigan. Plaintiff Makhoul owns a 2010 Mercedes GLK-350, which he purchased used on July 5, 2012, for approximately $26,480 from Mercedes-Benz Okemos Auto

Collection in Okemos, Michigan. Plaintiff Mahkoul's 2010 GLK-350 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff did not receive notice of the Defective Airbags or Inflator Defect. Plaintiff later received a letter from Mercedes informing him that his 2010 GLK-350 contained Takata airbags with the Inflator Defect that are subject to recall. To Plaintiff Makhoul's knowledge, the airbags in his 2010 GLK-350 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

55.    Plaintiff Kenneth Melde resides in Peachtree Corners, Georgia. Plaintiff Melde owns a 2012 Mercedes E-350 Cabriolet, which he purchased used on April 12, 2014, for approximately $36,500 from Bob King Buick-GMC in Wilmington, North Carolina. Plaintiff Melde purchased an extended warranty that covered his 2012 E-350 Cabriolet. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through television, brochures, and the internet that touted the safety and dependability of his vehicle and Mercedes vehicles generally. Plaintiff Melde contacted his local Mercedes dealership to inquire about the Takata airbag recall, and was told that it would be years before replacement parts are available for the airbags in his 2012 E-350 Cabriolet. To Plaintiff Melde's knowledge, the

airbags in his 2012 E-350 Cabriolet have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

56.     Plaintiff Diana Myers resides in Glendale, Arizona. Plaintiff owns a 2008 Mercedes C-350, which she purchased new in or about March 2008, for approximately $43,399 from Bill Heard Chevrolet, Inc. in Scottsdale, Arizona. Plaintiff's 2008 Mercedes C-350 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard television commercials that touted Mercedes's long record of durability and safety. In addition, a sales representative at the dealership emphasized the superior quality and safety features of the newly remodeled C-Class vehicles, specifically including airbag safety. Plaintiff Myers learned of the recall from a letter she received from Defendant Mercedes in or about April 2016, notifying her that the Takata driver-side front airbag in Plaintiff's 2008 Mercedes C-350 was subject to recall. Since then, Plaintiff Myers has asked the Mercedes of Arrowhead dealership in Peoria, Arizona about the status of the recall. The dealership has told Plaintiff that no repair or replacement parts are available. To Plaintiff's knowledge, the airbags in her 2008 Mercedes C-350 have not been repaired or replaced. The value of

Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

57.     Plaintiff Kristen Nevares resides in San Diego, California. Plaintiff Nevares owns a 2012 Mercedes GLK-350, which she purchased new on September 1, 2012, for approximately $45,233 from Mercedes-Benz of Escondido in Escondido, California. Prior to purchasing the vehicle, Plaintiff Nevares viewed advertisements through the internet that touted the safety and dependability of her vehicle and Mercedes vehicles generally. Plaintiff Nevares received a recall notice from Mercedes informing her that the Takata airbags in her 2012 GLK-350 are subject to recall due to the Inflator Defect. To Plaintiff Nevares's knowledge, the airbags in her 2012 GLK-350 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

58.     Plaintiff Aaron Patillo resides in Hixson, Tennessee. Plaintiff owns a 2010 Mercedes E-350, which he purchased used in or about May 2016, for approximately $20,000 from Prestige Auto in Chattanooga, Tennessee. Plaintiff's 2010 Mercedes E-350 was covered by a written warranty. Plaintiff Patillo viewed

and heard Mercedes advertisements touting the quality, safety and durability of Mercedes's vehicles. Plaintiff Patillo learned of the recall from news reports. On or about October 28, 2017, Plaintiff Patillo sent a certified letter to Defendant Mercedes in Atlanta, Georgia, seeking information regarding his vehicle's airbags. To date, Plaintiff has not received a response from Mercedes. To Plaintiff's knowledge, the airbags in her 2010 Mercedes E-350 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

59.     Plaintiff Omeko Pearson resides in Alexander City, Alabama. Plaintiff Pearson owns a 2007 Mercedes C-230 Sport, which he purchased used on or about April 20, 2013, for approximately $14,690 Kimpco Auto in Alexander City, Alabama. Prior to purchasing the vehicle, Plaintiff did not receive notice of the Defective Airbags or Inflator Defect. On information and belief, Plaintiff received recall notices for the airbags in August and October 2017. To Plaintiff Pearson's knowledge, the airbags in his 2007 C-230 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

60.    Plaintiffs John F. and Nancy D. Phillips reside in Veronia, Oregon. Plaintiffs Phillips own a 2010 Mercedes R-350 Blue TEC, which they purchased used on May 24, 2014, for approximately $29,500 from a private party in Portland, Oregon. Prior to purchasing the vehicle, Plaintiffs viewed or heard commercials through television, brochures, and pamphlets that touted the safety and dependability of their vehicle and Mercedes vehicles generally. To Plaintiffs' knowledge, the airbags in their 2010 R-350 Blue TEC have not been repaired or replaced. The value of Plaintiffs' vehicle has been diminished as a result of the Inflator Defect. If Plaintiffs had known about the Inflator Defect, they either would have not purchased the vehicle, or would not have paid as much as they did for it.

61.    Plaintiff Shanella Prentice resides in Whitman, Massachusetts. Plaintiff Prentice owns a 2014 Mercedes C-300, which she purchased used in March 2016, for approximately $23,500 from Herb Chambers Honda of Seekonk in Seekonk, Massachusetts. Plaintiff Prentice's 2014 C-300 was covered by the original manufacturer's warranty. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through radio, television, and the internet that touted the safety and dependability of her vehicle and Mercedes vehicles generally. Plaintiff received a recall notice in or about October 2017. To Plaintiff Prentice's knowledge, the airbags in her 2014 Mercedes C-300 have not been repaired or

replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

62.    Plaintiff Theresa Marie Fusco Radican resides in Port Saint Lucie, Florida. Plaintiff owns a 2008 Mercedes C-300, which she purchased new in or about October 2007, for approximately $41,208 from Inskip Autocenter Mercedes-Benz, in Warwick, Rhode Island. Plaintiff's 2008 Mercedes C-300 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard television commercials that touted Mercedes's long record of durability and safety. Plaintiff Radican learned of the recall from a letter she received from Defendant Mercedes in or about July 2016, notifying her that the Takata passenger-side front airbag in Plaintiff's 2008 Mercedes C-350 was subject to recall. Prior to that, Defendant Mercedes sent a letter to Plaintiff Radican regarding her driver-side airbag recall. Plaintiff Radican contacted the Mercedes of Fort Pierce dealership about the status of the recall. The dealership told Plaintiff that no repair or replacement parts are available. To Plaintiff's knowledge, the airbags in her 2008 Mercedes C-300 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had

known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

63.     Plaintiff Jeffery Reeves resides in Bogalusa, Louisiana. Plaintiff owns a 2011 Mercedes GL450, which he purchased used in or about February 2014, for approximately $35,000 from Bill Hood Chevrolet in Covington, Louisiana. Plaintiff's 2011 Mercedes GL450 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard commercials that touted Mercedes's long record of durability and safety. Plaintiff learned of these recalls through news reports. To Plaintiff's knowledge, the airbags in his 2011 Mercedes GL450 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

64.     Plaintiff Curtis Scott resides in Vancouver, Washington. Plaintiff Scott owns a 2013 Mercedes GLK-350, which he purchased used in January 2016, for approximately $34,000 from Mercedes of Portland in Portland, Oregon. Plaintiff Scott's 2013 GLK-350 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff did not receive notice of the Defective Airbags or Inflator Defect. To Plaintiff Scott's knowledge, the airbags in his 2013 GLK-350

have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

65.     Plaintiff Bettie Taylor resides in Waynesboro, Mississippi. Plaintiff owns a 2010 Mercedes C-300, which she purchased used in or about May 2012, for approximately $28,690 from Bo Haarala Autoplex in Meridian-Forrest, Mississippi. Plaintiff's 2013 Mercedes C-300 was covered by a written warranty. Plaintiff Taylor purchased an extended warranty for her 2010 Mercedes C-300. Prior to purchasing the vehicle, Plaintiff viewed and heard advertisements that touted Mercedes's long record of durability and safety. Plaintiff Taylor learned of the recall from a letter she received from Mercedes in or about September 2016, notifying her that the Takata front airbags in Plaintiff's 2010 Mercedes C-300 were subject to recall, but that no replacement parts were available. To Plaintiff's knowledge, the airbags in her 2010 Mercedes C-300 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

66.     Plaintiff Maria de Lourdes Viloria resides in Laredo, Texas. Plaintiff Viloria owns a 2011 Mercedes C-300, which she purchased new on August 26, 2011, for approximately $44,042 from Powell Watson Mercedes-Benz in Laredo, Texas. Plaintiff Viloria's 2011 C-300 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through radio, television, and the internet that touted the safety and dependability of her vehicle and Mercedes vehicles generally. To Plaintiff Viloria's knowledge, the passenger-side airbag in her 2011 C-300 was replaced on November 11, 2012, after a car accident, but the driver-side airbag in her 2011 C-300 has never been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

67.     Plaintiff Marcela Warmsley resides in Lancaster, California. Plaintiff Warmsley owns a 2011 Mercedes C-300, which she purchased used in July 2015, for approximately $17,000 from West Coast Auto in Montclair, California. Plaintiff Warmsley purchased an extended warranty to cover her 2011 C-300. Prior to purchasing the vehicle, Plaintiff viewed advertisements through the internet touting the safety and dependability of her vehicle and Mercedes vehicles generally. Plaintiff Warmsley received a recall notice from Mercedes informing

42

her that the Takata airbags in her 2011 C-300 are subject to recall due to the Inflator Defect. Plaintiff attempted to taker her 2011 C-300 to her local Mercedes dealership for the recall repair, but was told that the dealership did not have the necessary parts. To Plaintiff Warmsley's knowledge, the airbags in her 2011 Mercedes C-300 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

68.     Plaintiff Jennifer Wilmoth resides in Edison, New Jersey. Plaintiff owns a 2011 Mercedes C-300, which she purchased used in or about October 2015, for approximately $15,000 from Atlantic Automall, in West Islip, New York. Plaintiff's 2011 Mercedes C-300 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard advertisements on the internet, television, and at the dealership that touted Mercedes's long record of durability and safety. Plaintiff Wilmoth learned of the recall from a letter she received from Mercedes in or about September 2016, notifying her that the Takata front airbags in Plaintiff's 2011 Mercedes C-300 were subject to recall. When she received the letter, Plaintiff Wilmoth contacted the Mercedes dealership in Smithtown, New York, about the status of the recall. The dealership told Plaintiff that no repair or

replacement parts were available, and that they would contact her when replacement airbags became available. She has not been contacted by the dealership. To Plaintiff's knowledge, the airbags in her 2011 Mercedes C-300 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

69.    Plaintiffs and the proposed Class were harmed and suffered actual damages. The defective Takata airbags significantly diminish the value of the vehicles in which they are installed. Such vehicles have been stigmatized as a result of being recalled and equipped with Takata airbags, and the widespread publicity of the Inflator Defect.

70.    Further, Plaintiffs and the proposed Class did not receive the benefit of their bargain; rather, they purchased and leased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation. Plaintiffs and the Class, either through a higher purchase price or higher lease payments, paid more than they would have had the Inflator Defect been disclosed. Plaintiffs and the Class were deprived of having a safe, defect-free

airbag installed in their vehicles, and Defendants unjustly benefited from their unconscionable delay in recalling their defective products, as they avoided incurring the costs associated with recalls and installing replacement parts for many years.

71.     Plaintiffs and the proposed Class also suffered damages in the form of out-of-pocket and loss-of-use expenses and costs, including but not limited to expenses and costs associated with taking time off from work, paying for rental cars or other transportation arrangements, and child care.

72.     The defective Takata airbags create a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury to Plaintiffs and the proposed Class.

## **GENERAL FACTUAL ALLEGATIONS**

73.     Plaintiffs bring this action on behalf of themselves and all persons similarly situated who purchased or leased Class Vehicles (defined below). Plaintiffs seek redress individually and on behalf of those similarly situated for economic losses stemming from Defendants' manufacture, sale or lease, and false representations concerning the defective airbags in the Class Vehicles, including but not limited to diminished value.  Plaintiff, on behalf of themselves and those

similarly situated, seeks to recover damages and statutory penalties, and injunctive relief/equitable relief.

74.    "Class Vehicles" refers to all vehicles in the United States that have Defective Airbags (defined below) that were manufactured, sold, or leased by Defendants.

75.    "Defective Airbags" refers to all airbag modules (including inflators) manufactured by Takata ("Takata airbags") that use ammonium nitrate as the propellant in their inflators (the "Inflator Defect"), including (a) all airbags subject to the recalls identified below; (b) all Takata airbags in Defendants' vehicles subject to recalls relating to Takata's May 18, 2015 DIRs, the Coordinated Remedy Order issued by NHTSA in *In re Docket No. NHTSA-2015-0055 Coordinated Remedy Program Proceeding*, and amendments thereto, concerning Takata's ammonium-nitrate inflators, and the Consent Order issued by NHTSA in *In re EA 15-001 Air Bag Inflator Rupture*, and any amendments thereto; and all Takata airbags in Defendants' vehicles subject to any subsequent expansion of pre-existing recalls, new recalls, amendments to pre-existing DIRs, or new DIRs, announced prior to the date of an order granting class certification, relating to the tendency of such airbags to over-aggressively deploy or, rupture.

76.    All Defective Airbags contain the Inflator Defect. As a result of the Inflator Defect, Defective Airbags have an unreasonably dangerous tendency to: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag.

77.    The following table identifies, to the best of Plaintiff's understanding and without the benefit of discovery, the vehicles either recalled or scheduled to be recalled by Defendants, and which of the front airbags were included in the recall for each vehicle (driver, passenger, or both):

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Daimler | 16V-081 | Mercedes-Benz | AMG C63 | 2009-2011 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | AMG E63 | 2010-2011 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | AMG SLK55 | 2007-2008 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | C230 | 2005-2007 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | C230 Kompressor | 2005 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | C300 | 2008-2011 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | C300 4Matic | 2008-2011 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | C300 4matic Sedan | 2008-2011 | Both |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Daimler | 16V-081 | Mercedes-Benz | C320 | 2005 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | C350 | 2006-2011 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | C350 Sedan | 2008-2011 | Both |
| Daimler | 16V-081 | Mercedes-Benz | C63 AMG | 2009-2011 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | C63 AMG Sedan | 2008-2011 | Both |
| Daimler | 16V-081 | Mercedes-Benz | E350 | 2010-2011 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | E350 4Matic | 2010-2011 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | E350 Cabriolet | 2011 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | E350 Cabriolet | 2011 | Both |
| Daimler | 16V-081 | Mercedes-Benz | E550 | 2010-2011 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | E550 | 2011 | Both |
| Daimler | 16V-081 | Mercedes-Benz | E550 4Matic | 2010-2011 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | E550 Cabrio | 2011 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | E550 Coupe | 2010-2011 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | E63 AMG | 2010-2011 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | GL320 Diesel | 2009-2010 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | GL350 BlueTec 4Matic | 2011-2012 | Driver |

48

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Daimler | 16V-081 | Mercedes-Benz | GL350 Diesel | 2011-2012 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | GL450 | 2009-2012 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | GL450 4Matic | 2009-2012 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | GL550 | 2009-2012 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | GL550 4Matic | 2009-2012 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | GLK350 | 2010-2012 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | GLK350 | 2010-2011 | Both |
| Daimler | 16V-081 | Mercedes-Benz | GLK350 4Matic | 2010-2012 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | GLK350 4Matic | 2010-2011 | Both |
| Daimler | 16V-081 | Mercedes-Benz | ML320 BlueTec 4Matic | 2012 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | ML320 BlueTec 4Matic | 2009-2010 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | ML320 Diesel | 2009-2010 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | ML350 | 2009-2011 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | ML350 4Matic | 2009-2011 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | ML350 4Matic | 2012-2014 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | ML450 4Matic Hybrid | 2010-2011 | Driver |

49

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Daimler | 16V-081 | Mercedes-Benz | ML450 Hybrid | 2010-2011 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | ML550 | 2009-2011 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | ML550 4Matic | 2009-2011 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | ML63 AMG | 2009-2009 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | ML63 AMG | 2010-2011 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | R 320 Diesel | 2009 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | R 320 Diesel | 2010 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | R320 CDI 4Matic | 2009-2010 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | R320 CDI 4Matic | 2010 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | R350 | 2009 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | R350 | 2010-2012 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | R350 4Matic | 2009 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | R350 4Matic | 2010-2012 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | SLK280 | 2007-2008 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | SLK350 | 2007-2008 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | SLK55 AMG | 2007-2008 | Driver |
| Daimler | 16V-081 | Mercedes-Benz | SLS AMG GT | 2013-2014 | Driver |
| Daimler | 16V-081 | Mercedes- | AMG | 2009-2011 | Driver |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| | | Benz | ML63 | | |
| Daimler | 16V-363 | Mercedes-Benz | E350 Convertible | 2011 | Both |
| Daimler | 16V-363 | Mercedes-Benz | E350 Coupe | 2010-2011 | Both |
| Daimler | 16V-363 | Mercedes-Benz | E550 Coupe | 2010-2011 | Both |
| Daimler | 16V-363 | Mercedes-Benz | SLS | 2011-2014 | Driver |
| Daimler | 16V-363 | Mercedes-Benz | SLS | 2011 | Both |
| Daimler | 16V-363 | Mercedes-Benz | SLS AMG | 2011 | Both |
| Daimler | 16V-363 | Mercedes-Benz | SLS AMG Cabrio | 2012 | Driver |
| Daimler | 16V-363 | Mercedes-Benz | SLS AMG Coupe | 2011-2014 | Driver |
| Daimler | 17V-017 | Mercedes-Benz | E350 Cabriolet | 2012 | Driver |
| Daimler | 17V-017 | Mercedes-Benz | E350 Cabriolet | 2012 | Both |
| Daimler | 17V-017 | Mercedes-Benz | E350 Coupe | 2012 | Both |
| Daimler | 17V-017 | Mercedes-Benz | E350 Coupe 4Matic | 2012 | Both |
| Daimler | 17V-017 | Mercedes-Benz | E550 Cabrio | 2012 | Driver |
| Daimler | 17V-017 | Mercedes-Benz | E550 Coupe | 2012 | Driver |
| Daimler | Amended Annex A | Mercedes-Benz | C-Class | 2009-2010, 2013 | Passenger |
| Daimler | Amended Annex A | Mercedes-Benz | C-Class | 2010-2014 | Passenger |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Daimler | Amended Annex A | Mercedes-Benz | E-Class Cabrio | 2013 | Passenger |
| Daimler | Amended Annex A | Mercedes-Benz | E-Class Coupe | 2013 | Passenger |
| Daimler | Amended Annex A | Mercedes-Benz | E-Class Coupe | 2010 | Passenger |
| Daimler | Amended Annex A | Mercedes-Benz | GLK Class | 2010-2015 | Passenger |
| Daimler | Amended Annex A | Mercedes-Benz | SLS-Class | 2013 | Passenger |
| Daimler | Amended Annex A | Mercedes-Benz | E-Class Cabrio | 2011-2017 | Passenger |
| Daimler | Amended Annex A | Mercedes-Benz | E-Class Coupe | 2010-2017 | Passenger |
| Daimler | Amended Annex A | Mercedes-Benz | GLK Class | 2013 | Passenger |
| Daimler | Amended Annex A | Mercedes-Benz | GLK Class | 2010 | Passenger |
| Daimler | Amended Annex A | Mercedes-Benz | SLS Class | 2015 | Driver |
| Daimler | Amended Annex A | Mercedes-Benz | SLS Class | 2011-2015 | Passenger |

78.    As recently as January 2018, Defendants and Takata announced additional large recalls, identified as 18E-001, -002, and -003.

79.    The part of the airbag at issue in this matter is the inflator. The inflator consists of a metal canister loaded with propellant wafers or pellets, and is placed in the airbag module. Upon impact, the propellant wafers or pellets ignite,

triggering a chemical reaction that produces gas, which in turn inflates the fabric airbag. This process occurs within milliseconds.

80.     The following basic illustration, included earlier in this Complaint as well, depicts Takata's airbag module:



81.     When it began manufacturing airbags in the 1980s, Takata used sodium azide as the propellant within its inflators. In the mid-1990s, Takata began using a different propellant called 5-aminotetrazole, in part due to toxicity issues associated with sodium azide.

82.     In the late-1990s, Takata's managers pressured its engineers in Michigan to devise a lower cost propellant based upon ammonium nitrate, a compound used in fertilizer and explosives.

83.     In 1999, as the ammonium nitrate design was being considered, Takata's engineering team in Moses Lake, Washington, raised objections and pointed to explosives manuals that warned of the risk of disintegration and irregular, overly-energetic combustion. As one former Takata engineer noted, "ammonium nitrate stuck out like a sore thumb," and yet his team had only "a couple days" to do its review.

84.     In fact, ammonium nitrate is an inherently volatile and unstable chemical. Daily temperature swings are large enough for the ammonium nitrate to cycle through three of its five crystalline states, adding to its volatility. It also readily absorbs moisture from the atmosphere. The chemical's sensitivity to temperature and moisture cause it to break down over time, which can lead to unpredictable and dangerous results, such as violent detonation or the chemical becoming effectively inert. As one explosives expert bluntly stated in *The New York Times*, ammonium nitrate "shouldn't be used in airbags," and is better suited to large demolitions in mining and construction.

85.     From the time it began investigating ammonium nitrate in the late 1990s, Takata understood these risks and often expressed them publicly. It stated in a 1995 patent document that ammonium nitrate propellant would be vulnerable to temperature changes and that its casing "might even blow up." Takata further recognized that "[o]ne of the major problems with the use of ammonium nitrate is that it undergoes several crystalline phase changes," one of which occurs at approximately 90 degrees Fahrenheit. If ammonium nitrate undergoes this type of temperature change, the compound may "expand and contract and change shape resulting in growth and cracking" of the propellant, which might cause an airbag inflator to "not operate properly or might even blow up because of the excess pressure generated."

86.     Takata further admitted in a 1999 patent document that pure ammonium nitrate is "problematic" because many gas generating compositions made with it are "thermally unstable."

87.     Similarly, in a 2006 patent application, Takata discussed the need to test the performance of ammonium nitrate at various extreme temperatures because it is an unstable chemical, and these tests could reveal many problems, including "over-pressurization of the inflator leading to rupture." The 2006 patent document purportedly contained a fix for that sort of rupturing. Notably, the alleged fix in

2006 came *after* a rupture incident in 2004 that caused a serious injury, and incidents continued to mount after that time as well. Takata submitted a patent application with other purported "fixes" as recently as 2013. These ongoing, albeit unsuccessful, efforts show that Takata knew throughout the relevant period that its airbags were defective.

88.     In a 2007 patent for allegedly phase stabilized ammonium nitrate that incorporates a scavenging additive designed to retain moisture in an effort to prevent these catastrophic ruptures, Takata representatives noted the following:

> Without the addition of the [additive], and as shown in [the patent], the ballistic curves indicate that changes occurred in the gas generant after 50 cycles. After 100 cycles the ballistic performance was very aggressive and did not meet USCAR specification. After 200 cycles the ballistic performance was so aggressive the ballistic performance was so aggressive that the inflator ruptured due to extremely high internal pressures.

89.     Thus, Takata's inflators were "grenades" in the glove box or steering wheel waiting to detonate after going through 100 or 200 cycles of thermal cycling, which, of course, is something cars in the real world will eventually do.

90.     The use of this additive (or any other) designed to address ammonium nitrate's hygroscopic nature (affinity for moisture) is, at best, a temporary fix because at some point the additive will no longer be able to absorb the excess moisture and the ballistic curves will again exceed specification leading to ruptures.

91.     The only conceivable "advantage" to the compound for an airbag manufacturer and its OEM clients, according to the expert quoted in *The New York Times*, is that it is "cheap, unbelievably cheap." Takata had originally planned to use tetrazole as its propellant, which is not only more stable than ammonium nitrate, but also yields other desired benefits, such as being more environmentally friendly. But tetrazole was too expensive for Takata, and executives ultimately pressured engineers in Michigan to develop a cheaper alternative.

92.     Not surprisingly, other major airbag manufacturers, including Autoliv and Key Safety Systems have reportedly avoided using ammonium nitrate as a propellant. Takata's representative confirmed at a Congressional hearing in June 2015 that Takata is the only major airbag manufacturer that uses ammonium nitrate as a primary propellant in its inflators.

93.     Takata and Defendants became further aware of the instability of its ammonium nitrate propellant from the persistent and glaring quality control problems Takata encountered in its manufacturing operations. The Takata plants that manufactured the airbags and inflators at issue in this Complaint include plants located in Moses Lake, Washington, LaGrange, Georgia, and Monclova, Mexico. Defendants routinely visited and audited Takata operations, including in response to quality and safety concerns.

57

94.     Starting in 2001, engineers at Takata's Monclova, Mexico plant identified a range of problems, including rust, which they said could have caused inflators to fail. Between 2001 and 2003, Takata struggled with at least 45 different inflator problems, according to dozens of internal reports titled "potential failures" and reviewed by *Reuters*. On at least three occasions between 2005 and 2006, Takata engineers struggled to eliminate leaks found in inflators, according to engineering presentations. In 2005, Shainin, a U.S. consulting firm, found a pattern of additional problems.

95.     Underscoring Takata's reckless use of the volatile and unstable ammonium nitrate, on March 31, 2006, the Monclova, Mexico plant was rocked by violent explosions in containers loaded with propellant. Defendants were well aware of this explosion, as detailed in § III, *infra*.

96.     Apparently, not even that terrible accident could prompt serious and lasting improvements: in a February 2007 email to multiple colleagues, one manager stated that "[t]he whole situation makes me sick," referring to Takata's failure to implement checks it had introduced to try to keep the airbags containing the unstable and volatile ammonium nitrate propellant from failing.

97.    Takata engineers also scrambled as late as 2009 to address its propellant issues after "inflators tested from multiple propellant lots showed aggressive ballistics," according to an internal presentation in June 2009.

98.    Based on internal Takata documents, Takata was struggling to meet a surge in demand for its airbags. Putting profits ahead of safety, Takata exhibited shoddy and reckless behavior in the handling of its ammonium nitrate propellant. In March 2011, a Takata supervisor at the Monclova, Mexico plant sent an e-mail to other employees stating "A part that is not welded = one life less, which shows we are not fulfilling the mission." The title of the e-mail was "Defectos y defectos y defectos!!!!" This shoddy and reckless attitude permeated all of Takata's operations and facilities.

99.    Yet handling problems at Takata facilities persisted: another manager urged employees to examine the propellant visible in a cross section of an airbag inflator, noting that "[t]he propellant arrangement inside is what can be damaged when the airbags are dropped. . . . Here you can see why it is important to handle our product properly." A 2009 presentation of guidelines on handling inflators and airbag units also stressed the dangers of mishandling them. The presentation included a link to a video that appeared to show side-curtain airbags deploying violently, sending the inflator hurtling into the car's cabin.

100.   Despite knowing it was shipping potentially deadly products, including inflators containing unstable and volatile ammonium nitrate propellant, Takata resisted taking back damaged or wet airbag modules, in part because Takata struggled to keep up with a surge in demand for its airbags through the early- and mid-2000s as it won big new clients.

101.   On information and belief, at all relevant times, Mercedes exercised close control over suppliers, including airbag and airbag inflator suppliers. On information and belief, Mercedes prepared and maintained design specifications for both the airbag and inflator, which suppliers like Takata were and are required to meet. On information and belief, given its general control over its suppliers, Mercedes knew or should have known, prior to approving the Defective Airbags that Takata used an ammonium nitrate propellant in its inflators.

102.   Further, any cursory attention paid to Takata's track record should have further fueled their concern over ammonium nitrate inflators. Takata airbags made it to market in model year 2001. By 2003, there were two ruptures, including one that lead to a fatality in Arizona, and another that took place in a vehicle manufactured by a Group of Five member, BMW. The BMW incident took place in Switzerland and was jointly investigated by BMW and Takata.

103.   Additional, alarming incidents continued to mount regularly, including a rupture in 2004 in Alabama, and a trio of incidents in the summer of 2007. These four incidents took place in Honda vehicles, and notably, Honda filed a standard report with U.S. safety regulators for each of them.

104.   Had they acted as reasonable OEMs, Defendants would have kept abreast of information submitted by a major OEM about a key supplier to a key regulator. Moreover, by November 2008—well after Defendants had accumulated significant knowledge regarding the troubling risks of Takata airbags—Honda issued its first public recall in the United States. The recall notice expressly noted the risk that Takata airbags "could produce excessive internal pressure," causing "the inflator to rupture," spraying metal fragments through the airbag cushion ("2008 Recall"). Defendants had every obligation to act swiftly to protect their past and prospective consumers, and yet they did not.

105.   Tragically, this failure would then be repeated serially over the next five years. Following the 2008 Honda recall, yet additional ruptures took place, many causing accidents, injuries, and/or fatalities. By 2009, Honda had issued its second recall in the United States, putting all OEMs, including Defendants, on still further notice of the airbag defect. This pattern of incidents and recalls continued

unabated—with increasingly large recalls of Takata airbags issued in 2010, 2011, and 2013—and yet prompted no response from Defendants.

106.   On April 11, 2013, Takata filed a DIR titled "Certain Airbag Inflators Used as Original Equipment." While it sought to cabin the scope of the problem, it again openly admitted concerns over propellant moisture absorption and deterioration, and "over-aggressive combustion" and inflator "rupture." Shortly thereafter, six major automakers, including Nissan, Mazda, BMW, Pontiac, and Honda, issued recalls of 3.6 million vehicles containing Takata airbags. Defendants, by contrast, remained silent.

107.   Defendants' silence persisted as other OEMs drastically increased their recalls in 2014. By the end of June 2014, the number of vehicles recalled due to the Inflator Defect had increased to over 6 million, which would ultimately only be a small fraction of the total recall. And, with public knowledge of the defect growing, the number of rupture-related injuries and fatalities continued to grow as well. In the summer and fall of 2014 alone, seven incidents were widely reported, including unsuspecting individuals who died, were rendered quadriplegic, and suffered severe head injuries. That pace continued in the years to come.

108.   By November 18, 2014, it was clear to NHTSA that even the extensive recalls to date were insufficient. NHTSA therefore demanded a national

recall of many OEMs, and began speaking out more forcefully against OEMs' endless delay and intransigence in the face of a deadly risk.

109.   Defendants' disinterest in resolving the issue continued to stand out. When 10 major OEMs met in December 2014 to "sort out a way to understand the technical issues involved," Mercedes was shockingly absent. When many of those same OEMs proceeded to jointly and publicly retain an outside consultant to finally investigate the defect, Defendants again remained on the sidelines. And, whereas Honda announced an advertising campaign in March 2015 to promote the recall—a step it could and should have taken a decade ago—Defendants could not be bothered with even that belated step.

110.   In light of ongoing testing, on May 18, 2015, Takata filed four DIRs with NHTSA and agreed to a Consent Order regarding its (1) PSDI, PSDI-4, and PSDI-4K driver air bag inflators; (2) SPI passenger air bag inflators; (3) PSPI-L passenger air bag inflators; and (4) PSPI passenger air bag inflators, respectively. Takata admitted that "a defect related to motor vehicle safety may arise in some of the subject inflators." In testimony presented to Congress following the submission of its DIRs, Takata's representative admitted that the use of ammonium nitrate is a factor that contributes to the tendency of Takata's airbags to rupture, and that as a result, Takata will phase out the use of ammonium nitrate.

111.   At this juncture, Defendants could have easily taken the obvious step of discontinuing use of ammonium nitrate, in addition to immediate, complete recalls, even if the DIRs did not yet implicate all ammonium nitrate inflators. They did not. Takata would go on to issue additional DIRs, including in January 2016, January 2017, and January 2018.

112.   Prior to that, in September 2015, NHTSA was forced to take the initiative and write Mercedes seeking information on their use of Takata airbags. Eventually, in its Third Amended Coordinated Remedy Order issued December 9, 2016, NHTSA expanded the recall to Mercedes.

113.   As a result of Takata's admission that its inflators are defective, the total number of recalled vehicles nationwide will exceed 40 million.

114.   Over the past 15 years that Defendants, OEMs, and their supplier have known there was a problem with the safety of their airbags, there have been at least 12 deaths and 180 injuries linked to the Defective Airbags nationwide. Globally, the numbers are even larger. As detailed above, the incidents date back to at least 2003, and involve vehicles made by numerous OEMs. Defendants knew or should have known of the Inflator Defect by virtue of these incidents—among many other sources of knowledge—but failed to disclose the nature and scope of the Inflator Defect.

115.    The Defendants were on further notice due to additional, unusual Takata airbag deployments that should have prompted further inquiry into the airbags' fitness for use. A review of publicly-available NHTSA complaints shows dozens of incidents of Takata airbags inadvertently deploying in the Class Vehicles, events that may be tied to the unstable and volatile ammonium nitrate propellant. These complaints started as early as September 2005, and involve vehicles manufactured by Acura, BMW, Dodge, Ford, Mitsubishi, Pontiac, Subaru, and Toyota. Some of these incidents showed still further signs of the Inflator Defect, including airbags that deployed with such force that they caused the windshield to crack, break, or shatter, and others that caused unusual smoke and fire (or both).

116.    Over one million Mercedes vehicles have officially been recalled as part of the massive action arising from the installation of the Defective Airbags. This includes Sprinter vans with Dodge, Freightliner, or Mercedes badges.

117.    At all relevant times, in advertisements and promotional materials, Defendants continuously maintained that their vehicles were safe and reliable, while uniformly omitting any reference to the Inflator Defect. Plaintiff, directly or indirectly, viewed or heard such advertisements or promotional materials prior to purchasing or leasing Class Vehicles. The misleading statements about Class

Vehicles' safety in Defendants' advertisements and promotional materials were material to decisions to purchase or lease Class Vehicles.

118.   Examples of Defendants' safety and reliability representations, which consistently remind consumers of its premium quality and recognition as a premium brand, include the following.

a.   In a May 15, 2013 Mercedes press release on the Mercedes website, Dr. Dieter Zetsche, Chairman of the Board of Management of Daimler AG and Head of Mercedes-Benz Cars said: "Rather than being about safety or aesthetics, power or efficiency, comfort or dynamism, our aspirations were 'the best or nothing' in every respect. No other car stands for the Mercedes-Benz brand promise more than the S-Class."

b.   In a June 18, 2014 Mercedes press release on the Mercedes website, Mercedes says: Hallmark Mercedes high level of safety- To make top-class safety available for everyone, the CLS-Class will in the future be fitted with a host of new assistance systems along with existing systems with upgraded functionality.

c.   In a March 22, 2016 Mercedes press release on the Mercedes website, Mercedes says about its Coupe: In keeping with the Mercedes-Benz tradition, the body forms the foundation for exemplary crash safety. A high-

strength safety passenger compartment forms the core of this concept. It is surrounded by specially designed and crash-tested deformation zones, which ensure the best possible occupant safety. In addition to 3-point safety belts with pyrotechnical and reversible belt tensioning and belt-force limitation for driver, front passenger and those in the outer rear seats, numerous airbags serve to protect the vehicle's occupants in an accident. These include combined thorax/pelvis side bags for driver and front passenger and an optimized window bag extending over both seat rows, optional side bags for the outer rear seats and a driver knee bag.

> d.     In a September 1, 2015 press release on the Mercedes website, Prof. Dr. Thomas Weber, Member of the Daimler Board of Management responsible for Group Research and Head of Mercedes-Benz says, "The S-Class sets the pace on the global market when it comes to safety, efficiency and comfort."

> e.     In a 2011 C-Class brochure, Mercedes touted its "legacy of safety innovation," promising "top-rated safety" that is "not just equipped with a list of safety features. It's engineered as an orchestrated system that designed to make the most of the precious milliseconds it takes to avoid, or survive, a collision."

f.     In a 2011 M-Class brochure, Mercedes touted its "Five Star Safety." With respect to airbags in particular, the brochure promises "10-way air bag protection… eight air bags offer a total of 10 ways of protection."

g.     In a 2012 S-Class Brochure, Mercedes claimed that the "S-Class is engineered not merely to meet expectations, but to redefine every measure of how an automobile… can protect its occupants." The S-Class is "engineered with visionary safety advances."

119.   Contrary to these representations and countless others like them, Mercedes failed to equip the Class Vehicles with airbags that would meet these standards, and they failed to disclose to consumers that their vehicles actually contained dangerous and defective airbags.

120.   Though the first Takata Airbag related recall was launched years earlier, Defendants failed to initiate a field action or recall until 2016. Shockingly, Defendants are recalling later model years, including 2017 models, because of the risk of the Takata airbags rupturing.

121.   Even those vehicles that have been recalled have little chance of being repaired in the near term. Under the recalls required under NHTSA's Coordinated Remedy Order, approximately 44 million vehicles will be recalled in the United States due to the Inflator Defect.

122.   At a Congressional hearing in June 2015, Takata's representative testified that Takata was shipping approximately 700,000 replacement inflators per month, and expected to increase production to 1 million replacement inflators per month by September 2015 – well short of the number required to supply the ten automakers that have issued recalls.

123.   At the current rate, it will take several years to produce enough Takata inflators to fix all recalled vehicles in the U.S., even setting aside the question of whether service departments would be able to provide the necessary services in a timely manner. As recently as February 2017, for example, Mercedes sought year-long extensions for completing the recall in approximately 800,000 of its vehicles. Under the revised schedules, the remedy will not even *begin* for certain of Mercedes vehicles until September 2019.

124.   Not surprisingly, authorized dealers are experiencing a severe shortage of parts to replace the faulty airbags.  Dealers have been telling frustrated car owners they can expect to wait many months before their airbags can be replaced.

125.   In response to the airbag replacement shortage, certain automakers have taken the extreme step of disabling passenger airbags entirely and putting a "Do Not Sit Here" decal in the vehicle until a proper repair can be made.  In the

alternative, some automakers are advising customers to refrain from driving their vehicles until the airbags can be replaced.

126.   Other automakers have also chosen to "repair" their customers' vehicles not by providing temporary replacement vehicles or replacement parts, but by disengaging the Takata airbags entirely.

127.   Congress has voiced concerns about this serious problem. Senators Richard Blumenthal and Edward J. Markey, in a letter to the Department of Transportation (DOT), said they were:

> [A]larmed and astonished that NHTSA has endorsed a policy recently announced by Toyota and GM that dealers should disable passenger-side airbags and instruct against permitting passengers in the front seat if replacement parts for these airbags are unavailable. As a matter of policy, this step is extraordinarily troubling and potentially dangerous. As a matter of law . . . §30122(b) of the Motor Vehicle Safety Act (49 U.S.C.) prohibits a manufacturer from knowingly making a safety device inoperative unless the [DOT] issues a specific exemption. We are unaware of an exemption from your office in the case of Takata airbags.

128.   The Class Vehicles are not safe to drive. They have been recalled, and yet replacement of the Defective Airbags could take years. Due to Defendants' failures, Plaintiffs and Class members are left with poor options: be without use of a vehicle; purchase, lease, or rent a new vehicle until Defendants complete the recall; or use a vehicle with a dangerous or disabled airbag over an extended period of time.

129.   As Senators Blumenthal and Markey further asserted, "all drivers deserve access to loaners or rental cars at no cost to them while they await repairs to their cars that make them safe enough to drive again."

130.   Yet, Defendants are not providing loaner or replacement vehicles on a comprehensive basis. Mercedes expressly stated that "there is no reason to offer a loaner vehicle."

131.   Perhaps most alarming, the replacement components manufactured by Takata that many OEMs, potentially including Defendants, are using to "repair" recalled Class Vehicles suffer from the same Inflator Defect that plagues the parts being removed: they use ammonium nitrate as the inflator's primary propellant. Indeed, Takata admitted in its submitted DIRs and at the June 2015 Congressional hearing that inflators installed in recalled vehicles as replacement parts are, in fact, defective and must be replaced yet again. And even recall notices issued in 2015 acknowledge that certain "replacement inflators are of the same design and materials as the inflators being replaced."

132.   Moreover, inspection of inflators manufactured by Takata as recently as 2014 and installed by manufacturers through the recall process reveals that the ammonium nitrate pellets within the inflators already show signs of moisture-induced instability, such as rust stains, the tendency to clump together, and size

variations.   As a result, Takata cannot reasonably assure Plaintiffs or Class members that Class Vehicles equipped with such post-recall replacement parts will be any safer than they were with the initial Defective Airbags.

133.   By way of example, Paragraph 30 of the November 2015 Consent Order provides that the NHTSA Administrator may issue final orders for the recall of Takata's desiccated phase stabilized ammonium nitrate ("PSAN") inflators, used as both original and replacement equipment, if no root cause has been determined by Takata or any other credible source, or if Takata has not otherwise shown the safety and/or service life of the parts by December 31, 2019.   But as of July 10, 2017, Takata began recalling certain desiccated PSAN inflators installed in Ford, Mazda and Nissan vehicles.

134.   Moreover, while Takata and automakers had previously assured the public that the Defective Airbags had been remedied and that the new airbags being placed in recalled vehicles were safe, in fact, several automakers have been or will be required to recall some vehicles from model year 2013 and later because of the risk of the Takata airbags rupturing.   And Takata has now admitted that replacement airbags installed in some recalled vehicles are defective as well, and cannot assure the public that replacement inflators containing ammonium nitrate are safe and not prone to rupture.

## TOLLING OF THE STATUTE OF LIMITATIONS

### I.        Fraudulent Concealment

135.  Upon information and belief, Defendants have known about the Inflator Defect in their Defective Airbags since at least the early 2000s. Prior to installing the Defective Airbags in their vehicles, Defendants knew or should have known of the Inflator Defect, and Defendants were or should have been made aware through the design process, testing, public reports of ruptures and adverse events, and regular recalls starting no later than 2008. Defendants have concealed from or failed to notify Plaintiff, Class members, and the public of the full and complete nature of the Inflator Defect.

136.  Although Defendants may have now acknowledged to safety regulators that Takata's airbags are defective, for years, Defendants did not fully investigate or disclose the seriousness of the issue and in fact downplayed the widespread prevalence of the problem.

137.  Any applicable statute of limitations has therefore been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

## II. **Estoppel**

138. Defendants were and are under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles. They actively concealed the true character, quality, and nature of the vehicles and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the vehicles. Plaintiffs and Class members reasonably relied upon Defendants' knowing and affirmative misrepresentations and/or active concealment of these facts. Based on the foregoing, Defendants are estopped from relying on any statute of limitations in defense of this action.

## III. **Discovery Rule**

139. The causes of action alleged herein did not accrue until Plaintiffs and Class members discovered that their vehicles had the Defective Airbags.

140. Plaintiffs and Class members, however, had no realistic ability to discern that the vehicles were defective until—at the earliest—after either the Defective Airbag exploded or their vehicles were recalled. And even then, Plaintiffs and Class members had no reason to discover their causes of action because of Defendants' active concealment of the true nature of the defect.

## CLASS ACTION ALLEGATIONS

141.   The Class' claims all derive directly from a single course of conduct by Defendants. This case is about the responsibility of Defendants, at law and in equity, for their knowledge, their conduct, and their products. Defendants have engaged in uniform and standardized conduct toward the Class. They did not differentiate, in degree of care or candor, in their actions or inactions, or in the content of their statements or omissions, among individual Class members. The objective facts on these subjects are the same for all Class members. Within each Claim for Relief asserted by the respective Class, the same legal standards govern. Additionally, many states, and for some claims all states, share the same legal standards and elements of proof, facilitating the certification of multistate or nationwide Class for some or all claims. Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

142.   Plaintiffs bring this action and seeks to certify and maintain it as a class action under Rules 23(a); (b)(2); and/or (b)(3); and/or c(4) of the Federal

Rules of Civil Procedure on behalf of themselves and a national Class defined as follows:

> All persons in the United States who, prior to the date on which the Class Vehicle was recalled, (a) entered into a lease for a Class Vehicle or (b) bought a Class Vehicle and (i) still own or lease the Class Vehicle, or (ii) sold the Class Vehicle after the date on which the Class Vehicle was recalled, or (iii) following an accident, whose Class Vehicle was declared a total loss after the date on which the Class Vehicle was recalled.

## I. **Numerosity**

143. This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). There are millions of Class Vehicles nationwide, and thousands of Class Vehicles in each of the States. Individual joinder of all Class members is impracticable.

144. The Class is ascertainable because its members can be readily identified using registration records, sales records, production records, and other information kept by Defendants or third parties in the usual course of business and within their control. Plaintiffs anticipate providing appropriate notice to each certified Class, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

## II.    Predominance of Common Issues

145.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because questions of law and fact that have common answers that are the same for each of the respective Class predominate over questions affecting only individual Class members. These include, without limitation, the following:

a.    Whether the Class Vehicles suffer from the Inflator Defect;

b.    Whether Defendants knew or should have known about the Inflator Defect, and, if so, how long Defendants have known of the defect;

c.    Whether Defendants had a duty to disclose the defective nature of the Class Vehicles to Plaintiffs and Class members;

d.    Whether Defendants omitted and failed to disclose material facts about the Class Vehicles;

e.    Whether Defendants' concealment of the true defective nature of the Class Vehicles induced Plaintiffs and Class members to act to their detriment by purchasing the Class Vehicles;

f.    Whether Defendants' conduct tolls any or all applicable limitations periods by acts of fraudulent concealment, application of the discovery rule, or equitable estoppels;

g.      Whether Defendants misrepresented that the Class Vehicles were safe;

h.      Whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Class Vehicles were designed, manufactured, and sold with defective airbag inflators;

i.      Whether Defendants' conduct, as alleged herein, was likely to mislead a reasonable consumer;

j.      Whether Defendants' statements, concealments and omissions regarding the Class Vehicles were material, in that a reasonable consumer could consider them important in purchasing, selling, maintaining, or operating such vehicles;

k.      Whether Defendants violated each of the States' consumer protection statutes, and if so, what remedies are available under those statutes;

l.      Whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

m.      Whether Defendants' unlawful, unfair, and/or deceptive practices harmed Plaintiffs and the Class;

n.     Whether the Class Vehicles have suffered a diminution of value because of the Defective Airbags;

o.     Whether Defendants have been unjustly enriched by their conduct;

p.     Whether Plaintiffs and the Class are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

q.     Whether Plaintiffs and the Class are entitled to a declaratory judgment stating that the airbag inflators in the Class Vehicles are defective and/or not merchantable;

r.     Whether Defendants should be declared responsible for notifying all Class members of the Inflator Defect and ensuring that all vehicles with the airbag inflator defect are promptly recalled and repaired;

s.     What aggregate amounts of statutory penalties are sufficient to punish and deter Defendants and to vindicate statutory and public policy;

t.     How such penalties should be most equitably distributed among Class members;

u.     Whether certain Defendants associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

### III.   Typicality

146.   This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiff's claims are typical of the claims of the Class members, and arise from the same course of conduct by Defendants. The relief Plaintiffs seek is typical of the relief sought for the absent Class members.

### IV.   Adequate Representation

147.   Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products.

148.   Plaintiffs and his counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Class.

### V.   Superiority

149.   This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Defendants have acted and refused to act on grounds generally applicable to each Class, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to each Class as a whole.

150.   This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The common questions of law and of fact regarding Defendants' conduct and responsibility predominate over any questions affecting only individual Class members.

151.   Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

152.   The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed

by the benefits to the legitimate interests of the parties, the court, and the public of class treatment in this court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

153.   Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, the Class or subclasses for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into sub-Classes.

154.   Plaintiffs and the Class expressly disclaim any recovery in this action for physical injury resulting from the Inflator Defect without waiving or dismissing such claims. Plaintiffs are informed and believe that injuries suffered in crashes as a result of Defective Airbags implicate the Class Vehicles, constitute evidence supporting various claims, including diminution of value, and are continuing to occur because of Defendants' delays and inaction regarding the commencement

and completion of recalls, and because of the` installation of Defective Airbags as replacement airbags. The increased risk of injury from the Inflator Defect serves as an independent justification for the relief sought by Plaintiffs and the Class.

## REALLEGATION AND INCORPORATION BY REFERENCE

155.   Plaintiffs reallege and incorporate by reference all of the preceding paragraphs and allegations of this Complaint, including the Nature of Claims, Factual Allegations, Tolling Allegations, and Class Action Allegations, as though fully set forth in each of the following Claims for Relief asserted on behalf of the Class.

## CLAIMS FOR RELIEF

## COUNT 1

**Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301,** *et seq.*

156.   Plaintiffs bring this Count against Defendants on behalf of members of the Class.

157.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

158.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

159.   Each Plaintiff is a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Each Plaintiff is a consumer because he or she is a person entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

160.   Defendants are each a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301(4)-(5).

161.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

162.   Defendants provided Plaintiffs and the other Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Defendants warranted that the Class Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

163.   Defendants breached these implied warranties, as described in more detail above, and are therefore liable to Plaintiffs and the Class pursuant to 15

84

U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share a common design defect in that they are equipped with Defective Airbags containing the Inflator Defect. Defendants have admitted that the Class Vehicles are defective in issuing its recalls, but the recalls are woefully insufficient to address the Inflator Defect.

164.   Any efforts to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

165.   Any limitations on the warranties are procedurally unconscionable. There was unequal bargaining power between Defendants, on the one hand, and Plaintiffs and the other Class members, on the other.

166.   Any limitations on the warranties are substantively unconscionable. Defendants knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired. Defendants failed to disclose the Inflator Defect to Plaintiffs and the other Class members. Thus, Defendants' enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

167.   Plaintiffs and each of the other Class members have had sufficient direct dealings with either Defendants or its agents (dealerships) to establish privity of contract.

168.   Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between Defendants and their dealers, and specifically, of the implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the aforementioned defect.

169.   Plaintiffs provided written notice of breach to Defendants and a request to cure. Nonetheless, pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give Defendants notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

170.   Furthermore, affording Defendants an opportunity to cure its breach of written warranties would be unnecessary and futile here. At the time of sale or

lease of each Class Vehicle, Defendants knew, should have known, or was reckless in not knowing of its misrepresentations concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Defendants a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

171.   Plaintiffs provided written notice of breach of implied warranties and related consumer protection laws, and opportunity to cure, by letters to Defendants.

172.   Plaintiffs and the other Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because Defendants are refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Defective Vehicles by retaining them.

173.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to

be determined in this lawsuit. Plaintiffs, individually and on behalf of the other Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Class members in connection with the commencement and prosecution of this action.

174.   Plaintiffs also request, as a form of equitable monetary relief, re-payment of the out-of-pocket expenses and costs they have incurred in attempting to rectify the Inflator Defect in his vehicle. Such expenses and losses will continue as Plaintiffs and Class members must take time off from work, pay for rental cars or other transportation arrangements, child care, and the myriad expenses involved in going through the recall process.

175.   The right of Class members to recover these expenses as an equitable matter to put them in the place they would have been but for Defendants' conduct presents common questions of law. Equity and fairness requires the establishment by Court decree and administration under Court supervision of a program funded

by Defendants, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid.

## COUNT 2

### Fraudulent Concealment

176.  Plaintiffs bring this claim against Mercedes on behalf of themselves and the members of the Class under the common law of fraudulent concealment, as there are no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment. In the alternative, Plaintiffs brings this claim against Mercedes under the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

177. As described above, Mercedes made material omissions and affirmative misrepresentations regarding the Class Vehicles and the Defective Airbags contained therein.

178. Mercedes concealed and suppressed material facts regarding the Defective Airbags—most importantly, the Inflator Defect, which causes, among other things, the Defective Airbags to: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag.

179.   Mercedes took steps to ensure that its employees did not reveal the known Inflator Defect to regulators or consumers.

180.   On information and belief, Mercedes still has not made full and adequate disclosure, continues to defraud Plaintiffs and the Class, and continues to conceal material information regarding the Inflator Defect.

181.   Mercedes had a duty to disclose the Inflator Defect because it:

a.      Had exclusive and/or far superior knowledge and access to the facts, and Mercedes knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.      Intentionally concealed the foregoing from Plaintiffs and Class Members; and

c.      Made incomplete representations about the safety and reliability of the Defective Airbags and Class Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

182.   These omitted and concealed facts were material because they would be relied on by a reasonable person purchasing, leasing or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are

material concerns to a consumer. Plaintiffs and Class Members trusted Mercedes not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety, and to uphold its recall obligations under the Sale Agreement and governing laws.

183.   Mercedes concealed and suppressed these material facts to falsely assure purchasers and consumers that the Defective Airbags and Class Vehicles were capable of performing safely, as represented by Mercedes and reasonably expected by consumers.

184.   Mercedes also misrepresented the safety and reliability of the Defective Airbags and Class Vehicles, because it either (a) knew but did not disclose the Inflator Defect; (b) knew that it did not know whether its safety and reliability representations were true or false; or (c) should have known that its misrepresentations were false.

185.   Mercedes actively concealed or suppressed these material facts, in whole or in part, to maintain a market for its vehicles, to protect its profits, and to avoid recalls that would hurt the brand's image and cost Mercedes money. It did so at the expense of Plaintiffs and the Class.

186.   Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed or suppressed facts.

187.   Had they been aware of the Defective Airbags installed in the Class Vehicles, and Mercedes' callous disregard for safety, Plaintiffs and the Class either would have paid less for their Class Vehicles, or they would not have purchased or leased them at all. Plaintiffs and Class members did not receive the benefit of their bargain as a result of Mercedes' fraudulent concealment.

188.   Because of the concealment or suppression and/or misrepresentation of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of Mercedes' concealment of, and failure to timely disclose, the serious Inflator Defect in millions of Class Vehicles and the serious safety and quality issues caused by Mercedes' conduct.

189.   The value of all Class members' vehicles has diminished as a result of Mercedes' fraudulent concealment of the Inflator Defect, and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

190.   Accordingly, Mercedes is liable to Plaintiffs and the Class for their damages in an amount to be proven at trial, including, but not limited to, their lost

benefit of the bargain or overpayment for the Class Vehicles at the time of purchase, the diminished value of the Defective Airbags and the Class Vehicles, and/or the costs incurred in storing, maintaining or otherwise disposing of the defective airbags.

191.   Mercedes' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class's rights and well-being, and with the aim of enriching Mercedes. Mercedes' conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and affecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 3

### Negligence

192.   Plaintiffs bring this claim on behalf of themselves and members of the Class under the common law of negligence, as there are no true conflicts (case-dispositive differences) among various states' laws of negligence. In the alternative, Plaintiffs bring this claim against Mercedes under the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

193.   Mercedes owed a duty of care to Plaintiffs and Class members, who were foreseeable end users, to design and manufacture its vehicles so that they would not be defective or unreasonably dangerous to foreseeable end users, including Plaintiffs and Class members.

194.   Mercedes breached its duty of care by, among other things:

a.      Negligently and recklessly equipping the Class Vehicles with Defective Airbags;

b.      Negligently and recklessly failing to take all necessary steps to ensure that its products—which literally can make the difference between life and death in an accident—function as designed, specified, promised, and intended;

c.      Negligently and recklessly failing to take all necessary steps to ensure that profits took a back seat to safety;

d.      Negligently and recklessly failing to take all necessary steps to ensure that the Defective Airbags did not suffer from a common, uniform defect: the use of ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in their inflators; and

e.      Negligently and recklessly concealing the nature and scope of the Inflator Defect.

195.  Mercedes' negligence was the direct, actual, and proximate cause of foreseeable damages suffered by Plaintiffs and Class members, as well as ongoing foreseeable damages that Plaintiffs and Class members continue to suffer to this day.

196.  As a direct, actual, and proximate result of Mercedes' misconduct, Plaintiffs and members of the proposed Class were harmed and suffered actual damages, which are continuing in nature, including:

a.  the significantly diminished value of the vehicles in which the defective and unreasonably dangerous airbags are installed; and

b.  the continued exposure of Plaintiffs and Class members to an unreasonably dangerous condition that gives rise to a clear and present danger of death or personal injury.

197.  Mercedes' negligence is ongoing and continuing, because Mercedes continues to obfuscate, not fully cooperate with regulatory authorities, and manufacture replacement airbags that are defective and unreasonably dangerous, suffering from the same serious Inflator Defect inherent in the original airbags that are at issue in this litigation, which poses an unreasonable risk of serious foreseeable harm or death, from which the original airbags suffer.

## COUNT 4

### Unjust Enrichment

198.   Plaintiffs bring this claim on behalf of themselves and the members of the Class under the common law of unjust enrichment, as there are no true conflicts (case-dispositive differences) among various states' laws of unjust enrichment. In the alternative, Plaintiffs bring this claim against Mercedes under the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

199.   Mercedes has received and retained a benefit from the Plaintiffs and inequity has resulted.

200.   Mercedes benefitted through its unjust conduct, by selling Class Vehicles with a concealed safety-and-reliability related defect, at a profit, for more than these Vehicles were worth, to Plaintiff, who overpaid for his Vehicle, and/or would not have purchased his Vehicle at all; and who has been forced to pay other costs.

201.   It is inequitable for Mercedes to retain these benefits.

202.   Plaintiffs do not have an adequate remedy at law.

203.   As a result of Mercedes' conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

## COUNT 5

### Violation of the Georgia Fair Business Practices Act,
### Ga. Code Ann. §§ 10-1-390, *et seq.*

204. Plaintiffs bring this claim on behalf of the Class against Mercedes under Georgia law.  In the alternative, Plaintiffs bring this claim against Mercedes under the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

205. Plaintiffs and the Class are "consumers" within the meaning of Ga. Code Ann. § 10-1-392(6).

206. Plaintiff, the Class, and Defendants are "persons" within the meaning Ga. Code Ann. § 10-1-392(24).

207. Defendants were and are engaged in "trade" and "commerce" within the meaning of Ga. Code Ann. § 10-1-392(28).

208. The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code Ann. § 10-1-393(a), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another," and "[a]dvertising

97

goods or services with intent not to sell them as advertised," Ga. Code Ann. § 10-1-393(b).

209.   By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, Defendants engaged in unfair or deceptive practices prohibited by the FBPA, including: (1) representing that the Class Vehicles and/or the Defective Airbags installed in them  have characteristics, uses, benefits, and qualities which they do not have; (2) representing that they are of a particular standard, quality, and grade when they are not; and (3) advertising them with the intent not to sell or lease them as advertised. Defendants participated in unfair or deceptive acts or practices that violated the Georgia FBPA.

210.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

211.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such

concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

212.   As alleged above, Defendants have known of the Inflator Defect in the Defective Airbags since at least 2008 and likely years before. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

213.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Georgia FBPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

214.   In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by

repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

215.  Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

216.  Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Class.

217.  Defendants knew or should have known that their conduct violated the Georgia FBPA.

218.  As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the

Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

219.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

220.   Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

    a.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

    b.   Intentionally concealed the foregoing from Plaintiff; and/or

    c.   Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

221.   Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

222.   Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Georgia Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

223.   Plaintiffs and the Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would not have paid as much for their vehicles or would not have purchased or leased it at all. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

224.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

225.   As a direct and proximate result of Defendants' violations of the Georgia FBPA, Plaintiffs and the Class have suffered injury-in-fact and/or actual damage.

226.   Plaintiffs and the Class are entitled to recover damages and exemplary damages (for intentional violations) per Ga. Code Ann. § 10-1-399(a).

227.   Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA per Ga. Code Ann. § 10-1-399.

228.   In accordance with Ga. Code Ann. § 10-1-399(b), Plaintiff's counsel, on behalf of Plaintiff, served Defendants with notice of their alleged violations of the Georgia FBPA relating to the Class Vehicles and/or the Defective Airbags installed in them purchased by Plaintiffs and the Georgia Sub-Class, and demanded that Defendants correct or agree to correct the actions described therein. As Defendants have failed to do so, Plaintiffs seek compensatory and monetary damages to which Plaintiffs and Class Members are entitled.

## **PRAYER FOR RELIEF**

Plaintiff, on behalf of themselves and all others similarly situated, requests the Court to enter judgment against Defendants, as follows:

A.     An order certifying the proposed Class, designating Plaintiffs as the named representatives of the Class, designating the undersigned as Class Counsel, and making such further orders for the protection of Class members as the Court deems appropriate, under Fed. R. Civ. P. 23;

B.     A declaration that the airbags in Class Vehicles are defective;

C.     An order enjoining Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles, and such other injunctive relief that the Court deems just and proper;

D.     An award to Plaintiffs and Class Members of compensatory, exemplary, and punitive remedies and damages and statutory penalties, including interest, in an amount to be proven at trial;

E.     An award to Plaintiffs and Class Members for the return of the purchase prices of the Class Vehicles, with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale, for damages and for reasonable attorney fees;

F.     A Defendant-funded program, using transparent, consistent, and reasonable protocols, under which out-of-pocket and loss-of-use expenses and damages claims associated with the Defective Airbags in Plaintiff's and Class Members' Class Vehicles, can be made and paid, such that Defendants, not the Class Members, absorb the losses and expenses fairly traceable to the recall of the vehicles and correction of the Defective Airbags;

G.     A declaration that Defendants must disgorge, for the benefit of Plaintiffs and Class Members, all or part of the ill-gotten profits they received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiffs and Class Members;

H.     An award of attorneys' fees and costs, as allowed by law;

I.     An award of prejudgment and post judgment interest, as provided by law;

J.     Leave to amend this Complaint to conform to the evidence produced at trial; and

K.     Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated: March 14, 2018                    /s/ *E. Adam Webb*
                                         E. Adam Webb
                                         G. Franklin Lemond, Jr.
                                         WEBB, KLASE & LEMOND, LLC
                                         1900 The Exchange, S.E.
                                         Suite 480
                                         Atlanta, GA 30339
                                         Telephone: 770.444.9325
                                         *Adam@WebbLLC.com*
                                         *Franklin@WebbLLC.com*

                                         David S. Stellings
                                         LIEFF CABRASER HEIMANN &
                                           BERNSTEIN, LLP
                                         250 Hudson Street, 8th Floor
                                         New York, NY  10013-1413
                                         Telephone:  212.355.9500
                                         *dstellings@lchb.com*

                                         Nimish R. Desai
                                         LIEFF CABRASER HEIMANN &
                                           BERNSTEIN, LLP
                                         275 Battery Street, 29th Floor
                                         San Francisco, CA  94111-3339
                                         Telephone:  415.956.1000
                                         *ndesai@lchb.com*

                                         *Counsel for Plaintiffs*